H. WOODY MEGGS, D/B/A ROSE CITY SHEET METAL WORKS *v.* CENTRAL SUPPLY COMPANY, INC.

[No. 1-873A51. Filed February 27, 1974.]

*George W. Hand, Scotten & Hinshaw,* of New Castle, for appellant.

*Clarence H. Doninger, Cym H. Lowell, Dutton, Kappes & Overman* of Indianapolis, *Robert T. Wisehart,* of Middletown, for appellee.

LOWDERMILK, J.—Plaintiff-appellee (Central Supply) filed its complaint in an action on account against H. Woody Meggs d/b/a Rose City Sheet Metal Works (appellant herein) and against Robert R. Brown, d/b/a Rose City Sheet Metal Works. The complaint alleged that certain goods had been ordered

by Rose City Sheet Metal Works, beginning July 13, 1971. The complaint prayed damages in the amount of $2,482.49 plus interest for the merchandise so ordered.

Meggs filed his answer, including denials along with an affirmative defense. The second affirmative defense was in the form of a cross claim against Robert R. Brown d/b/a Rose City Sheet Metal Works.

The cause was tried to the court and following plaintiff's evidence the court reserved a ruling on a motion by Meggs for a judgment on the evidence. Following the evidence presented by Meggs on his own behalf the court entered judgment in favor of Central Supply and against appellant Meggs. The defendant Brown was defaulted for failure to appear.

Meggs timely filed his motion to correct errors, which was by the court overruled.

The evidence most favorable to the appellee reveals that on July 10, 1971, Meggs sold his business, Rose City Sheet Metal Works, to Brown. The contract called for all assets of the business to be sold, including all equipment and inventory, good will, and the name of the business. Included in the assets were the names "H. Woody Meggs d/b/a Rose City Sheet Metal Works" and "Rose City Sheet Metal Works, H. W. Meggs, Proprietor." Meggs also gave Brown a list of the business suppliers, which included Central Supply.

Meggs had dealings with Central Supply from 1961 through 1967, with purchases being made on account in each year inclusive. The purchases for each year were of small amounts. Meggs paid his bills to Central Supply as soon as the bills were received by him.

When Meggs sold his business to Brown he failed to give notice of the sale to any of his suppliers. He did, however, send written notice to Central Supply on August 28, 1971, and said notice was received by Central Supply on September 3, 1971.

Soon after the sale was completed Brown apparently began ordering furnaces and other supplies from Central Supply. These purchases were in a larger amount than had been the custom of Meggs to order from Central Supply but the method of placing the orders appears to have been substantially the same. Although some orders were placed by Brown after notice was given, Central Supply recovered only for supplies furnished through September 3, 1971.

Meggs contends that the decision of the trial court is not supported by sufficient evidence, is contrary to the evidence, and is contrary to law. Meggs contends that Central Supply did not prove that Meggs was responsible for the supplies ordered by Brown. Meggs argues that there is no evidence of an express or implied contract between Central Supply and Meggs following the sale. Meggs points out that the orders were not placed by him and he received no benefit from these orders.

It is also contended by Meggs that no other theory of law would allow Meggs to become liable to Central Supply in this case. Meggs contends that he has no duty to furnish notice of the sale of his business to his former suppliers and that in the absence of any duty he cannot be held liable for subsequent purchases by Brown. Brown was not an actual agent of Meggs and Meggs did not authorize Brown to place the orders with Central Supply. Meggs also contends that he cannot be liable under the doctrines of equitable estoppel or fraudulent or negligent representation as said theories were not pleaded in the complaint.

Liability of a proprietor of a business being operated under a trade name is discussed as follows in 52 Am. Jur., Trademarks, Trade Names, etc., § 38, p. 530:

> "The proprietor of a business conducted under a trade-name, who transfers it without notice, will continue liable for supplies subsequently furnished his successor by one with knowledge of his former proprietorship, although he had never transacted business with him."

The basis for the Am. Jur. statement quoted above is found in the case of *Hendley* v. *Bittinger,* 249 Pa. 193, 94 A. 831, where the following is stated:

> " 'It may be regarded as well settled,' says Sterrett, J., in delivering the opinion in Clark v. Fletcher, 96 Pa. 416, 418, 'that when an ostensible or known member of a co-partnership retires therefrom, and wishes to shield himself from liability for future debts of the firm, it is necessary that personal notice of his withdrawal be given to all who have had dealings with the firm, and that notice be given, by publication or otherwise, to all others.' . . . The defendant was liable to all persons knowing his former ownership of the business who extended credit to the firm after the transfer of the business without public or personal notice of his withdrawal therefrom, although they had not transacted business with the firm. . . ."

In oral argument both Meggs and Central Supply were of the opinion that this case presents a new question of law in this state and neither party has cited to this court any authority directly on point. In researching this question we reviewed authorities cited by the parties and beyond those authorities, in rooting through the archives, we uncovered a hog case, namely, *Elverson et al.* v. *Leeds et al.* (1884), 97 Ind. 336, which, in our opinion, resolves the issues in the case at bar.

In *Elverson, supra,* a greenhouse was owned and operated by one Hannah A. Leeds and the business was carried on under the name of "Leeds & Co." While carrying on the business she purchased from Elverson (a greenhouse supplier) quantities of merchandise over a period of several years. These purchases were made by Mrs. Leeds placing orders with Elverson and said orders being shipped to her. The account was under the name of Leeds & Co. and based on the responsibility of Mrs. Leeds to pay for any purchases ordered thereunder.

Mrs. Leeds, in 1882, sold, assigned, and transferred to her son her entire interest in the greenhouse business, including

the right to use the name "Leeds & Co." All of this was done with no notice being given to Elverson. The son continued the business under the name of Leeds & Co. with the knowledge, consent and approval of Mrs. Leeds, who was aware that purchases were being made under the company name.

In the case at bar, Meggs, Brown, and Central Supply bear the same relationship as Mrs. Leeds, her son, and Elverson.

Elverson continued to fill orders that were placed by the son under the name of Leeds & Co. in the belief that Mrs. Leeds was still the owner of the business and that she was still liable for all goods purchased. The court, on appeal, framed the issue in that case as follows:

> "The real dispute is whether Hanna A. Leeds is also liable. The appellants insist that, under the circumstances stated, it was her duty to notify them that she had ceased to do business under the name of 'Leeds & Co.,' and that her failure to do so renders her liable for the goods in question. . . ."

The facts in the case did not show that the son was either a partner or an agent of the mother, but the court, in discussing any liability of the mother, stated as follows:

> ". . . In such cases it has been uniformly applied, and the fact of such relation [sic, agency] has not been deemed essential to create liability. Indeed the rule does not rest upon such pre-requisite, but rather upon the fact that since third parties have been led to believe that a certain condition of things existed, and have extended their credit upon the faith of such assurances, the party making them shall be bound by them. . . ."

The court then discussed an analogous situation under partnership law as follows:

> "A retiring partner sustains no relation to the remaining members that actually authorizes them to bind him; neither did the mother to the son. Such members continue the business in the same name, and so did the son. In these respects the cases are precisely alike. The only difference is that the partner sells a portion, and permits the business to continue, while the mother sells the whole, and permits

the business to continue. What possible difference can it make to third parties without notice whether the mother sells a part or the whole, or whether she retires as a partner or sells as owner. In either case the consequences are the same, and we can perceive no reason why she should be liable in one case and not in the other. Third parties are just as likely to lend their credit, and just as liable to be defrauded as though she were a retiring partner; indeed, from a third party's standpoint, she appears as nothing less. She engages in business under a firm name, which imports a partnership, and the business continues under such name, without any notice that she has ceased her connection with it. Why should she not be treated like such partner, and held to the same obligations. The same reasons certainly exist, and as the same consequences may follow, we think the same rules should apply."

The court went on to conclude that the use of the firm name by the son (new owner) with the mother's (former owner) knowledge, consent and approval rendered her liable to the supplier.

The court reasoned that Mrs. Leeds would be liable under the facts as outlined above and discussed the issue as follows:

". . . The facts averred show that under this name she did business with the appellants, and that they knew that she was 'Leeds & Co.,' or was liable for the debts contracted under that name. The act of doing business under that name was an unequivocal representation to the appellants that she was 'Leeds & Co.,' or was liable for debts thus contracted, and the adoption of such name, and the act of doing business with the appellants under it, were, if no one else was represented by the name, tantamount to an assurance that 'Leeds & Co.' was, in fact, Hannah A. Leeds. Having given the appellants the assurance that 'Leeds & Co.' was, in fact, Hannah A. Leeds, the son could not thereafter contract with the appellants under such name while they remained in ignorance of the facts, without such act operating as a continued assurance that Hannah A. Leeds was still doing business under the name of 'Leeds & Co.' When, therefore, the son did business under such name with the appellants, he was continually representing to them that his mother was still doing business under such name, and as the business was done under such name, with the 'knowledge, consent and approval' of his mother, it

necessarily follows that she permitted him to thus hold her out as doing business under such name. This would, of course, render her liable to the appellants. . . . If the appellants were authorized to regard the name of 'Leeds & Co.' as the name under which Hannah A. Leeds did business, then the use of such name by the son, with her 'knowledge, consent and approval,' will bind her as though she was in fact doing business under such name."

It is our opinion that the facts in *Elverson, supra,* are directly on point with the facts in the case at bar and the same reasoning and result would apply.

In the case at bar Meggs allowed Brown to use the firm name pursuant to the contract and the evidence most favorable to the appellee discloses that Meggs had knowledge of the fact that Brown was ordering merchandise under the business name. The contract for sale of the business establishes that Brown was using the firm name with the knowledge, consent, and approval of Meggs.

The rationale behind the *Elverson* case is that a third party when dealing with a business has a right to assume that the owner of that business will be liable for orders placed under that name. When orders continue to come in under the business name the supplier has every right to assume that the owner is responsible for the supplies and would have no way of knowing that a new owner was in fact running the business unless the supplier had actual or constructive knowledge of the change in ownership. The facts in the case at bar show that Central Supply had no actual or constructive knowledge of the change of ownership until it received the letter from Meggs on September 3, 1971.

Pursuant to the holding in *Elverson, supra,* it is our opinion that the trial court correctly found that Meggs was liable to Central Supply for the supplies in question.

Judgment affirmed.

Robertson, P.J. and Lybrook, J., concur.

NOTE.—Reported at 307 N.E.2d 288.